UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY INTERNATIONAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FISH AND WILDLIFE | ) |
| SERVICE, et al., | ) Civil Action No. 16-720 (RBW) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| _____ | ) |

DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants,[1] by and through counsel,

hereby renew their motion for summary judgment in their favor as to the remaining issues

involving Freedom of Information Act ("FOIA") Exemption 4, 5 U.S.C. § 552(b)(4), because

there is no genuine issue as to any material fact, and Defendants are entitled to judgment as a

matter of law.

---

[1] Defendants are: the United States Fish and Wildlife Service ("FWS"); United States Department of the Interior ("DOI"); and the Secretary of DOI.   It is well established that "[i]ndividual federal employees are not subject to suit under FOIA." Thomas v. FAA, Civ. A. No. 05-2391 (CKK), 2007 WL 219988, *3 (D.D.C. 2007); see also Whittle v. Moschella, 756 F. Supp. 589, 596 (D.D.C. 1991) ("The jurisdiction of this Court to enforce FOIA is limited to enjoining agency noncompliance, 5 U.S.C. § 552(a)(4)(B), and consequently no FOIA claim may be asserted against individual federal officials.") (citing Petrus v. Bowen, 833 F.2d 581, 583 (5th Cir. 1987); Sherwood Van Lines v. U.S. Dep't of Navy, 732 F. Supp. 240, 241 (D.D.C. 1990); Canadian Javelin v. SEC, 501 F. Supp. 898, 904 (D.D.C. 1980)).

The Court is respectfully referred to the memorandum, declaration, and statement of

material facts also submitted in support of this motion.

Respectfully submitted,

JESSIE K. LIU, DC Bar #472845
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: _____/s/_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC   20530
(202) 252-2536
mark.nebeker@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY INTERNATIONAL,  )
  )
            Plaintiff,  )
  )
            v.  )
  )
UNITED STATES FISH AND WILDLIFE  )
SERVICE, et al.,  ) Civil Action No. 16-720 (RBW)
  )
            Defendants,  )
  )
and  )
  )
SAFARI CLUB INTERNATIONAL,  )
  )
            Defendant-Intervenor.  )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and

pertains to requests Plaintiff submitted to the United States Fish and Wildlife Service (the

"Agency"), seeking "the following information from the Agency's Law Enforcement

Management Information System ("LEMIS") database:

> control number, species code, class, genus, species, subspecies, generic name, specific name, wildlife description, quantity, unit, country of origin, country IE, Purpose, Source, Action, DP CD, Disp. Date, I/E, Port code, value, U.S. Importer/Exporter, Foreign Importer/Exporter." FWS has numbered this Request "FWS/LE ADM 4-08-2014-01045."

Compl. ¶ 44; Declaration of Carrie Hyde-Michaels (ECF No. 29-1) ("First Hyde-Michaels

Decl.") ¶ 2.

After briefing on Defendants' earlier dispositive motion, the Supreme Court decided

Food Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356 (2019), altering the standards

for application of Exemption 4 of the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552(b)(4).   Thus, in ruling on Defendants' prior motion, this Court concluded as follows:

> FOIA Exemption 4 permits federal agencies to withhold "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4).   Until recently, the applicable test for whether records submitted involuntarily to an agency fell under Exemption 4 was set forth by the D.C. Circuit in National Parks and Conservation Association v. Morton, 498 F.2d 765 (D.C. Cir. 1974).   Under the National Parks test, Exemption 4 covered information that, if disclosed, would either (1) "impair the Government's ability to obtain necessary information in the future," or (2) "cause substantial harm to the competitive position of the person from whom the information was obtained." Id. at 770; see also PETA [v. U.S. Dep't of Health & Human Servs. 901 F.3d 343,] 350 [(D.C. Cir. 2018)].. Further, the Circuit held, the disclosure of involuntarily provided information presumptively did not impair the government's ability to obtain necessary information in the future. See Nat'l Parks I, 498 F.2d at 770; In Defense of Animals v. USDA, 656 F. Supp. 2d 68, 72 (D.D.C. 2009).
>
> Recently, however, the Supreme Court abrogated the National Parks test in Food Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356 (2019). The Court held that confidentiality under Exemption 4 does not depend on whether disclosure of the information would cause substantial competitive harm, but whether the entity sharing the information typically kept it private. Id. at 2363–64. The Court held open the possibility that confidential information might lose that character if it were provided to the government without any assurance that the information would remain confidential, but it did not need to decide that issue to resolve the case. Id. at 2363. "At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy," the Court held, "the information is 'confidential' within the meaning of Exemption 4." Id. at 2366.
>
> FWS relies on Exemption 4 to justify its redactions of the declared monetary value of the wildlife imported or exported. But the parties' briefing on Exemption 4 focuses on the National Parks test, as it was the controlling law when they filed their briefs. And, on the current record, the Court cannot determine how the factors in the new Food Marketing Institute test apply to these withholdings.   The Court will therefore deny without prejudice HSI's and Defendants' motions for summary judgment on Exemption 4 so that the parties may brief the issue in light of Food Marketing Institute.

Memo. Op. & Order of 8/15/19 (ECF No. 47) at 6-7.

Because the Agency has now processed Plaintiffs' request for records and released the portions not subject to withholding under the FOIA, the requests for relief as to information that is properly released are moot.   See First Hyde-Michaels Decl. ¶¶ 2-32, attached index (ECF No. 26-2);[1] Second Declaration of Carrie Hyde-Michaels ("Second Hyde-Michaels Decl.") ¶¶ 2-5. Where information has been withheld, the agency has satisfactorily documented the proper withholding of that information under Exemption 4 the FOIA.   See 5 U.S.C. § 552(b)(4); First Hyde-Michaels Decl. ¶¶ 3-32; Second Hyde-Michaels Decl. ¶¶ 2-5, Exh. A; Declaration of Cathy Wilson ("Wilson Decl."), ¶¶ 4-10.   Thus, summary judgment in favor of Defendants is in order.

A.    Legal Standards

In a FOIA action, the courts have jurisdiction only when an agency has improperly withheld agency records.   5 U.S.C. § 552(a)(4)(B).   It is well established that under the FOIA, "once the records are produced the substance of the controversy disappears and becomes moot since disclosure which the suit seeks has already been made."   Crooker v. U.S. State Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980); see also Boyd v. Crim. Div. of U.S. Dep't of Justice, 475 F.3d 381, 385 n.1 (D.C. Cir. 2007) ("Because the government advised during oral argument that these documents have been released to Boyd, Amicus's challenge to the invocation of Exemption 3 is moot.") (citing Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982)); see also Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec., 211 F. Supp. 3d 143, 146 (D.D.C. 2016) (to withstand a

---

[1]    Defendants note that although the Index references a "Montana Furs" there is no listing with that exact name on the 97 entities responding to the agency's November 1, 2016, Federal Register notice.   Rather, that reference is to "Western Montana Fur Center," which is described elsewhere as "Michael's Furs/Montana Fur Traders."   See Second Hyde-Michaels Decl. Exh. A (correspondence) at 310-15.

mootness argument in a FOIA action, the requestor must allege sufficient facts to support a policy and practice claim).   Defendants do not dispute that the Court has jurisdiction to decide its jurisdiction, and thus whether documents have been properly withheld.   However, the mootness of the case, at a minimum as to the information provided to Plaintiff, means that there is no longer a case or controversy subject to the Court's jurisdiction, at least as to the claim seeking to order the Defendants to process Plaintiff's request and seeking release of the information now released to Plaintiff and as to Plaintiff's request for declaratory relief.   See Bayala v. U.S. Dep't of Homeland Sec., 827 F.3d 31, 34-35 (D.C. Cir. 2016) (FOIA case is moot with regard to the documents that were released even where other issues remained to be decided); Arizonans for Official English v. Arizona, 520 U.S. 43, 6467 (1997) (to qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed); First Hyde-Michaels Decl. ¶ 27.

In a FOIA action, summary judgment is appropriate when, as here, the pleadings, together with the declarations, demonstrate that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Wash. Post Co. v. U.S. Dep't of Health & Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).   As the Supreme Court has declared, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."   Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

An agency satisfies the summary judgment requirements in a FOIA case by showing that each document was produced, not withheld, is unidentifiable, or is exempt from disclosure.

Weisberg v. U.S. Dep't of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980).   To meet its burden, a defendant may rely on affidavits or declarations and other evidence by the agency which show that the documents are exempt from disclosure.[2]   Summary judgment may be awarded to an agency in a FOIA or Privacy Act case solely on the basis of agency affidavits or declarations if the "affidavits are 'relatively detailed, non-conclusory, and not impugned' by evidence . . . of bad faith on the part of the agency."   Public Citizen, Inc. v. Dep't of State, 100 F. Supp. 2d 10, 16 (D.D.C. 2000) (quoting McGhee v. CIA, 697 F.2d 1095, 1102 (D.C. Cir. 1983)).   Once the Court determines that the declarations are sufficient, it need not inquire further.   Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001).   Because the Agency here has produced or properly withheld information, Plaintiff's Complaint should be dismissed or summary judgment entered in favor of Defendants.

        B.       Defendants Have Satisfied the FOIA.

        1.       The Searches

The Agency has searched and gathered the information sought by Plaintiff in the very database that Plaintiff requested.   Complaint, ¶¶ 40, 44-56; First Hyde-Michaels Decl. ¶¶ 2-6, 12-22, Ex. A.   Accordingly, there is no question that the Agency has searched the logical places likely to have records responsive to Plaintiff's FOIA request.   Id.   Because the search employed was reasonably likely to identify records responsive to Plaintiff's request, the Agency has properly supported this aspect of summary judgment.   Id.

---

[2]     For purposes of summary judgment, an agency's decision to withhold information from a FOIA requester is subject to de novo review by the courts.   Hayden v. Nat'l Sec. Agency Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979).

2.      The Withholdings

As reflected in the declarations and exhibits submitted on behalf of the Agency, the Agency has properly relied upon various exemptions where it has withheld responsive information subject to the FOIA.   Specifically, the Agency properly relies on exemptions, which are contained in the following sections of the FOIA: 5 U.S.C. § 552(b)(4), (b)(6), (b)(7)(C). See Hyde-Michaels Decl. ¶¶ 2-32 and Exh. A; Second Hyde-Michaels Decl. ¶¶ 2-5 and Exh. A.   As noted above, only the issue of the proper application of Exemption 4 remains.

a.   Withholdings Under 5 U.S.C. § 552(b)(4).

Exemption 4 restricts disclosure of information that constitutes "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4); Food Marketing, 139 S.Ct. at 2366.   The Food Marketing decision overturns the "substantial competitive harm" requirement from National Parks & Conservation Ass'n v. Morton, 498 F.2d 765 (D.C. Cir. 1974), holding that at least where information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, it is "confidential" within the meaning of Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4).   Food Marketing, 139 S. Ct. at 2363-64.   In moving for summary judgment on the Exemption 4 issue, Defendants have previously relied on the agency's reasonable determination that disclosure of the redacted material would cause substantial harm to the owner's competitive position.   However, under the Supreme Court's new decision, the withheld material falls within Exemption 4 regardless of any "showing of [] harm." Food Marketing, 139 S. Ct. 2363-66.

Plaintiff's FOIA request sought information concerning individuals or entities which import things into the United States.   Each of the companies which submitted information

-6-

indicating that they are engaged in such importations and/or activities, to some degree, so they necessarily have a commercial or financial interest in the responsive records.  First Hyde-Michaels Decl. ¶¶ 24-32; Willis Decl. ¶¶ 4-10, Exs. C, D.

Third, the withheld information is confidential and the public disclosure of the information would cause the companies substantial competitive harm.  Hyde-Michaels Decl. ¶¶ 24-32; Second Hyde-Michaels Decl. ¶¶ 4-5, Ex. A.  Hence, the National Parks test applies to the information which was withheld.  Thus, the confidential information withheld was properly withheld pursuant to Exemption 4.  First Hyde-Michaels Decl. ¶¶ 24, 32; Second Hyde-Michaels Decl. ¶¶ 4-5, Ex. A.

The information withheld under Exemption 4 includes information that could reveal the nature, cost, profit margin, and origin of the shipments, thereby enabling competitors to identify suppliers, ascertain import volumes, and estimate the prices that the affected submitters paid; and with it competitors could then contact the affected submitters' suppliers and offer a more attractive of volume and pricing, which would undercut the affected submitters, cause their costs to rise, or both.  First Hyde-Michaels Decl. ¶ 24, Ex. A (Chart).  Thus, the agency has gone beyond what is required to establish that the information withheld under Exemption 4 is subject to withholding.  Here, the Agency reasonably concluded that the information withheld under Exemption 4 would, if disclosed, cause substantial harm to the entities as to which it has asserted Exemption 4.  First Hyde-Michaels Decl. ¶¶ 24-28, Ex. A; Second Hyde-Michaels Decl. ¶¶ 3-4. This, goes even beyond the requirements of Food Marketing, 139 S. Ct. at 2363-66.   Therefore, because the withheld information is commercial or financial information and is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, this information was properly withheld under 5 U.S.C. § 552(b)(4).  See Food

-7-

Marketing, 139 S. Ct. at 2363-66; First Hyde-Michaels Decl. ¶¶ 24-28, Ex. A; Second Hyde-Michaels Decl. ¶¶ 3-4; Wilson Decl. ¶¶ 4-10, Exs. C, D.

> b.      Segregability

The D.C. Circuit has held that a District Court has an obligation, even in the absence of a specific challenge by a FOIA plaintiff on the issue, to make an independent inquiry into whether all reasonably segregable non-exempt information has been provided to the Plaintiff.   See Trans-Pacific Policing Agreement v. Customs Serv., 177 F.3d 1022, 1028 (D.C. Cir. 1999).   In this case, the detailed nature of the request itself and the limited nature of the information in the database fields makes clear that the only information withheld is that which is exempt by the FOIA exemptions found in 5 U.S.C. § 552(b)(4), (b)(6) and (b)(7)(C).   First Hyde-Michaels Decl. ¶¶ 22-27, 32; Second Hyde-Michaels Decl. ¶¶ 4-5, Exs. A, B.

CONCLUSION

WHEREFORE, the above civil action should be dismissed or summary judgment entered

in favor of Defendants.

Respectfully submitted,

JESSIE K. LIU, DC Bar #472845
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: _____/s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC   20530
(202) 252-2536
mark.nebeker@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY INTERNATIONAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FISH AND WILDLIFE | ) |
| SERVICE, et al., | ) Civil Action No. 16-720 (RBW) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| _____ | ) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h), Defendants proffer the following statement of material facts and citations in support of their motion for summary judgment.

1.      Carrie Hyde-Michaels is the Chief of the Branch of Freedom of Information Act ("FOIA"), Records, and Privacy for the U.S. Fish and Wildlife Service ("FWS") at the FWS's headquarters and, along with others, has worked on matters involving the case of *Humane Society International v. U.S. Fish and Wildlife Service*, Civ. A. No. 16-0720 (TJK).   January 26, 2018 Declaration of Carrie Hyde-Michaels ("First Hyde-Michaels Decl.") (ECF No. 29-1), ¶ 1.

2.      FWS has applied FOIA Exemptions 4, 6, 7(C), and 7(F), 5 U.S.C. §§ 552(b)(4), (b)(6), (b)(7)(C), and (b)(7)(F) in the case, but Plaintiff has indicated through counsel that it no longer intends to challenge the redactions made pursuant to Exemption 7(F) and the Court has previously addressed the remaining exemptions except for Exemption 4.   First Hyde-Michaels

Decl. ¶ 1; Exhibit 1 (January 12, 2018 Email from Laura Friend); August 15, 2019 memorandum Opinion (ECF No. 47).

3.      On June 2, 2014, August 21, 2014, and June 3, 2015, Humane Society International filed FOIA requests with the FWS, seeking broad categories of information residing in the FWS's Law Enforcement Management Information System, popularly known as LEMIS.   First Hyde-Michaels Decl. ¶ 2.

4.      LEMIS is an electronic database utilized by all FWS law enforcement offices and is routinely accessed by FWS conservation officers, wildlife inspectors, refuge officers, and special agents.   First Hyde-Michaels Decl. ¶¶ 2, 29.

5.      The LEMIS database serves as the portal in which all FWS wildlife violations are documented and intelligence is gathered and shared between law enforcement offices across the country; it also serves as the conduit for all declared, (i.e., lawful), imports and exports of wildlife and wildlife products and the database of all wildlife trade data in the United States, both legal and illegal. First Hyde-Michaels Decl. ¶ 2.

6.      The information residing in the LEMIS database comes from Form 3-177, the "Declaration for Importation or Exportation of Fish or Wildlife, which information is submitted under penalty of perjury.   First Hyde-Michaels Decl. ¶ 3.

7.      Form 3-177 is similar to the U.S. Customs and Border Protection ("Customs") declaration forms, albeit more detailed.   First Hyde-Michaels Decl. ¶ 3.

8.      As such, Form 3-177 elicits relevant information regarding the type and sourcing of the fish or wildlife, including but not limited to: the scientific name and common name of the animal; the quantity; monetary value; air waybill or bill of lading numbers, modes of conveyance

and commercial carrier identification; the personally identifiable information of the importer or exporter, their business and their associates (domestic and foreign); foreign and U.S. CITES numbers; country of species origin; and the date of importation/exportation. First Hyde-Michaels Decl. ¶ 3.

9.      The term "CITES" means the "Convention on International Trade in Endangered Species of Wild Fauna and Flora," which is an international agreement between governments. First Hyde-Michaels Decl. ¶ 3 fn. 2.

10.     As for the detailed information on Form 3-177, the information relating to the scientific and common name of the animal describes the type of animal being imported/exported. First Hyde-Michaels Decl. ¶ 4.

11.     The scientific name is used at the time of import or export to determine if the animal is legal under Federal, State, tribal and foreign law and whether the species requires permits.   First Hyde-Michaels Decl. ¶ 4.

12.     Accordingly, this information allows the FWS to identify which imports and exports need special permits and which are prima facie illegal. First Hyde-Michaels Decl. ¶ 4.

13.     Moreover, the scientific and common name information provided on Form 3-177 is used after import or export for statistical reporting purposes, monitoring of the wildlife trade, data management, and conservation assessments. First Hyde-Michaels Decl. ¶ 4.

14.     For its part, the quantity column allows the FWS to determine if the quantity is equal to or less than the quantity authorized under any permit, certificate or other authorization. First Hyde-Michaels Decl. ¶ 4.

15. The quantity of each species is used after import or export for statistical reporting purposes, monitoring of the wildlife trade for conservation purposes and for data management. First Hyde-Michaels Decl. ¶ 4.

16. The information relating to monetary value allows the FWS to verify compliance with the reported Customs' values at the time of import and export and to help determine appropriate monetary penalties for violations. First Hyde-Michaels Decl. ¶ 4.

17. The value is used after import and export to monitor markets and trends for valuable animals. First Hyde-Michaels Decl. ¶ 4.

18. As for the air waybill and bill of lading numbers, these provide specific information on the name of the carrier and a code representing the mode of transportation; the carrier's identifying "way bill" or "bill of lading" number for the shipment; the bonded location where the wildlife shipment is available for inspection; the number of cartons or containers with wildlife in the shipment; and any distinguishing markings on those cartons or containers. First Hyde-Michaels Decl. ¶ 4.

19. This information allows the FWS to plan the review and physical inspection of the shipment to ensure that it can inspect the shipment without excessive delays to the importer or exporter. First Hyde-Michaels Decl. ¶ 4.

20. Broker, agent, and freight forwarder information is collected to enable the FWS to identify and communicate with the representative of the individual or business on any matters regarding the wildlife shipment; and Customs' broker and identifier information is also collected to enable the FWS to match Customs records against that of the FWS.   First Hyde-Michaels Decl. ¶ 4.

-4-

21.     As for the information concerning modes of conveyance and commercial carrier identification, this allows the FWS to plan the review and physical inspection of the shipment to ensure that the agency can inspect the shipment without excessive delays to the importer or exporter. First Hyde-Michaels Decl. ¶ 5.

22.     The business and associates lines allow the FWS to track key and problem importers and exporters. First Hyde-Michaels Decl. ¶ 5.

23.     Foreign and U.S. CITES numbers, meanwhile, allow for tracking and reporting under international treaty obligations and demonstrate necessary authorization to trade in CITES specimens. First Hyde-Michaels Decl. ¶ 5.

24.     For its part, information relating to country of species origin allows for the tracking of the particular habitat that each animal comes from to determine if the species is allowed for import or export and to compare with information from permits, certificates and other authorizations.   First Hyde-Michaels Decl. ¶ 5.

25.     The date of importation/exportation allows the FWS, to plan for review of the information, to make arrangements for physical inspection of goods, and to determine if applicable licenses, permits, certificates or other authorizations are valid and to track and monitor inflows and outflows of species with relation to seasons.   First Hyde-Michaels Decl. ¶ 5.

26.     With respect to the plaintiff's FOIA requests at issue in this litigation, the FWS has denied much of the requested LEMIS data relating to the declared monetary value of wildlife under FOIA Exemption 4.   First Hyde-Michaels Decl. ¶ 6.

27.     Following the constructive denial of its administrative appeals, on April 18, 2016, the plaintiff filed an action in the United States Court for the District of Columbia, seeking declaratory and injunctive relief with respect to the FWS's assertion of FOIA exemptions.   First Hyde-Michaels Decl. ¶ 7.

28.     The FWS's regulations, specifically 43 C.F.R. § 2.29, require consultation with submitters before release of material the agency believes may be protected by FOIA Exemption 4.    First Hyde-Michaels Decl. ¶ 8.

29.     Given the large number of submitters associated with the requested data, pursuant to 43 C.F.R. § 2.27(b), the FWS initially alerted the affected Form 3-177 submitters through a notice (the "Notice") in the Federal Register on November 1, 2016 (81 Fed. Reg. 75838). First Hyde-Michaels Decl. ¶ 9.

30.     The Federal Register notice solicited "views from submitters with respect to whether certain records constitute 'trade secrets and commercial or financial information obtained from a person [that are] privileged or confidential' information under the FOIA…." First Hyde-Michaels Decl. ¶ 9.

31.     The Federal Register Notice contained detailed instructions for submitters and apprised the submitters of the legal standards applicable in this case.   First Hyde-Michaels Decl. ¶ 9.

32.     In response to the Federal Register Notice, the FWS received objections from 113 unique companies and 1,429 individuals; and the Agency reviewed the submissions by the objectors. First Hyde-Michaels Decl. ¶ 10.

33.    Fourteen companies responding to the Notice stated that there was no need to protect their LEMIS data as confidential business information under FOIA Exemption 4; and the FWS ensured that no Exemption 4 redactions were ultimately asserted in connection with such companies; these companies were: BioReliance; Boiron USA; Cincinnati Zoo; Columbus Zoo; Connecticut's Beardsley Zoo; Emory University; Fort Wayne Zoo; Moderna Therapeutics; Moody Zoo; Ricera Biosciences, LLC; Riverbanks Zoo & Garden; Smithsonian; Virginia Zoo; and Zoo Atlanta.   First Hyde-Michaels Decl. ¶ 11.

34.    After reviewing the objections received in response to the Notice, the FWS disclosed to the plaintiff all requested LEMIS data submitted to the FWS on Form 3-177 by *individuals*—including the LEMIS data relating to the 1,429 individuals who had voiced objections to such release in response to the Notice—with the exception of the individuals' names, which the FWS continues to withhold from public release under FOIA Exemptions 6 and 7(C).   First Hyde-Michaels Decl. ¶ 12.

35.    The Agency has properly withheld requested information under FOIA Exemption B(4), 5 U.S.C. § 552(b)(4).   First Hyde-Michaels Decl. ¶¶ 20-32; Second Declaration Of Carrie Hyde-Michaels, ¶¶ 2-5; Declaration of Cathy Willis ("Willis Decl."), ¶¶ 3-10 and Exh.C and Exh. D.

36.    Of the 113 initial objections to the Notice provided to the FWS by *companies* (as opposed to individuals), the agency determined that 93 objectors had provided sufficient information to allow the FWS conclude that such company was likely to suffer substantial competitive injury from disclosure of its submitted information; but this total is reached by counting as a single objector the duplicate submissions of Furz Canada and by counting as a

single objector the submissions of Jeannie Perron and others on behalf of: Boehringer Ingelheim Pharmaceuticals; Boehringer Ingelheim Vetmedica; Convance Laboratories; Convance Laboratories, Inc.; and Convance Research Products. First Hyde-Michaels Decl. ¶ 20 and Exh. A.

37. Accordingly, the FWS is withholding from the plaintiff, on the basis of FOIA Exemption 4, LEMIS data relating to these 93 objecting companies and, as they case may be, any related corporate entities. (By way of example, Ripley's Entertainment single objection served an objection for all of its corporate entities appearing in the responsive LEMIS data.) First Hyde-Michaels Decl. ¶ 20 and Exh. A (Chart); *accord* Willis Decl. ¶¶

38. The FWS required that each company objecting to the release of its information on the basis of FOIA Exemption 4 include a detailed explanation of who its competitors were and the nature of the competition. First Hyde-Michaels Decl. ¶ 21 and Exh. A; Willis Decl. ¶¶ 5-10 and Exh. C and Exh. D.

39. The FWS also required that each such company explain with specificity how disclosure of each category of information that the submitter objected to disclosing would contribute to competitive harm. First Hyde-Michaels Decl. ¶ 21 and Exh. A.

40. If a company did not respond to the Notice, or if its objection in response to the Notice did not, in the estimation of the FWS, suffice to establish that the withholding of its information pursuant to FOIA Exemption 4 would be upheld by a court of law, the FWS lifted any FOIA Exemption 4 redactions it had previously made in connection with such company prior to the initiation of this lawsuit. First Hyde-Michaels Decl. ¶ 21.

-8-

41.    Attached to Ms. Hyde-Michael's January 26, 2018 declaration is Exh. A, an Excel spreadsheet, which tracks each response received from each submitter-company.   First Hyde-Michaels Decl. ¶ 22 and Exh. A.

42.    Each submitter-company that objected to the release of their information has two lines associated with its company name.   First Hyde-Michaels Decl. ¶ 22 and Exh. A.

43.    The top line of Exh. A to the First Hyde-Michaels declaration designates each category to which the submitter-company objected to release by marking an "x" in the column for that category; and directly below, on the second line, is the FWS's final judgment of the submitter-company's argument and the exemption marking used to withhold the information, if applicable.    First Hyde-Michaels Decl. ¶ 22 and Exh. A.

44.    Where an objector has been overruled entirely they may nevertheless have an "x" notation under its "Names of U.S. importer/exporter and foreign importer/exporter with country code" column.   First Hyde-Michaels Decl. ¶ 23 and Exh. A (Chart).

45.    This is because all personal names in that column will be redacted under FOIA Exemptions 6 and 7(C) based on the sensitivity of the personally identifiable information, not based on the specific request of the submitter.   First Hyde-Michaels Decl. ¶ 23 and Exh. A (Chart).

46.    Of the 113 companies who objected, the FWS sustained all or part of 101 objections.   First Hyde-Michaels Decl. ¶ 24 and Exh. A (Chart).

47.    Every objector the FWS sustained was in the business of import, export, or research, or was subject to the LEMIS database because of the business that they ran; and those for whom the FWS sustained objections established that they (a) face actual competition, and (b)

substantial competitive harm would befall the submitter if the information reacted under FOIA Exemption 4 were to be made publicly available.   First Hyde-Michaels Decl. ¶ 24 and Exh. A.

48.     For example, the release of such information could reveal the nature, cost, profit margin, and origin of the shipments, thereby enabling competitors to identify suppliers, ascertain import volumes, and estimate the prices that the affected submitters paid. First Hyde-Michaels Decl. ¶ 24 and Exh. A (Chart).

49.     Competitors could then contact the affected submitters' suppliers and offer a more attractive of volume and pricing, which would undercut the affected submitters, cause their costs to rise, or both. First Hyde-Michaels Decl. ¶ 24 and Exh. A (Chart).

50.     A company could use the Species Code, Genus, Species, and Subspecies fields to determine which species are currently in demand, allowing them to plan their marketing and supply chain strategies. Hyde-Michaels Decl. ¶ 24 and Exh. A.

51.     Similarly, competitors could use LEMIS data to figure out and take advantage of shipping arrangements, causing delay and supply chain disruption. And if competitors learned the valuation and pricing information contained in LEMIS and/or Form 3-177, they could undercut the affected submitters in negotiations and gain valuable insights into the affected submitters' business operations.   Hyde-Michaels Decl. ¶ 24 and Exh. A.

52.     Competitors could also use this information to reverse-engineer the affected submitters' business model to the competitors' advantage and the affected submitters' disadvantage.   Hyde-Michaels Decl. ¶ 24 and Exh. A.

53.     Of the 1,429 individuals who initially objected to the release of their information on the basis of FOIA Exemption 4, the FWS sustained the objection of zero individuals.   Hyde-Michaels Decl. ¶ 25.

54.     After reviewing the objections received in response to the Notice, the FWS sent letters to the individuals who objected but did not meet their burden to justify the use of FOIA Exemption 4 to protect the LEMIS data relating to them.   First Hyde-Michaels Decl. ¶ 26.

55.     The FWS sent similar letters to companies that did not meet their burden.   First Hyde-Michaels Decl. ¶ 26.

56.     These initial letters described the LEMIS information that the FWS would be releasing to the plaintiff and gave the objector 10 days in which to either respond to or initiate a reverse-FOIA lawsuit; and these letters and the 10-day (minimum) time period are required under the Department's FOIA regulations.   First Hyde-Michaels Decl. ¶ 26.

57.     The FWS negotiated a rolling production schedule with the plaintiff for the release of all requested LEMIS information that was not, in the FWS's view, subject to withholding under a FOIA exemption.   First Hyde-Michaels Decl. ¶ 26.

58.     The FWS has turned over all relevant information to the Plaintiffs, with the exception of the FOIA Exemption 4, 6, and 7(C) (and, in one instance, 7(F)) information that is or was the subject of this litigation.    First Hyde-Michaels Decl. ¶ 27.

59.     To prepare for the defense of its use of FOIA Exemption 4 in this litigation, the FWS, through its counsel, invited submitters with sustained Exemption 4 objections to submit evidentiary declarations to protect their information.   First Hyde-Michaels Decl. ¶ 28.

60.     An adverse ruling in this litigation against the FWS would, in the estimation of the FWS, likely have negative effects on the FWS Office of Law Enforcement; and it would likely have a negative effect on the FWS's ability to enforce laws and regulations it administers and to investigate criminal activities involving protected wildlife and fauna.   First Hyde-Michaels Decl. ¶ 29.

61.     The FWS Office of Law Enforcement is the principal federal agency that is mandated to interdict, investigate, and bring to prosecution violators of the natural resource and conservation laws of the United States, and, to some extent, foreign laws.   First Hyde-Michaels Decl. ¶ 29.

62.     It is likely that an adverse ruling over the objections of these submitters whose Exemption 4 arguments the FWS has found to be persuasive would cause submitters, in some cases, to attempt to circumvent the LEMIS database.   First Hyde-Michaels Decl. ¶ 29.

63.     If the public cannot trust that their personal information, business information, and information about their business practices (to include sources and associates) will be appropriately protected, they will be incentivized to be overly vague on their Form 3-177, to fabricate portions of their Form 3-177, or to seek methods of importation that bypass the FWS entirely, i.e., push the cooperative public to violate the laws and regulations.   First Hyde-Michaels Decl. ¶ 29.

64.     If the information in the LEMIS database is compromised, this will likely undermine the laws and regulations the FWS has in place to implement its mandate and its ability to conduct investigations to interdict the unlawful commercialization and unlawful

-12-

importation/exportation of protected, endangered, injurious, or invasive species.   First Hyde-Michaels Decl. ¶ 29.

65.     It is essential that the FWS receive the Form 3-177 data and that the data be accurate.   First Hyde-Michaels Decl. ¶ 30.

66.     Without this data the FWS would not be able to monitor imports or exports of wildlife shipments and therefore would be unable to determine if imports or exports of wildlife shipments are in compliance with Federal, State, Tribal, and foreign laws.   First Hyde-Michaels Decl. ¶ 30.

67.     There are legal consequences to the United States government for failing to meet its legal obligations and responsibilities relating to import and export of wildlife; by way of example, the parties to the Convention on International Trade of Endangered Species of Wild Fauna and Flora ("CITES"), to which the U.S. is a signatory, can impose compliance measures, to include trade suspensions, on parties who fail to meet their treaty obligation to accurately identify and fully report to the CITES Secretariat on import and export of CITES specimens, including parts and products thereof, or for failing to enforce the restrictions on wildlife imports and exports under a number of international agreements.   First Hyde-Michaels Decl. ¶ 30.

68.     Moreover, the FWS relies on its partner agencies, such as Customs, in regards to intelligence sharing and interdiction strategies. First Hyde-Michaels Decl. ¶ 31; Second Hyde-Michaels Decl. ¶¶ 4-5 and Exh. A, Exh. B.

69.     If a ruling against the FWS is realized in this lawsuit, then there is a serious likelihood that Customs will not share any of its trade data with the FWS because of Customs' own regulatory requirements for protecting trade data; and this would likely have severe

adverse impact on the FWS's ability to enforce laws and regulations, interdict criminal activities, and bring violators to prosecution.   First Hyde-Michaels Decl. ¶ 31; Second Hyde-Michaels Decl. ¶ 4 and Exh. A.

70.    April 18, 2018, Carrie Hyde-Michaels submitted executed a second declaration in connection with this case ("Second Hyde-Michaels Declaration").  Willis Decl. ¶ 5.   As explained in Paragraph 4 of the Second Hyde-Michaels Declaration, Exhibit A to that declaration provided both (a) an index of 98 statements the FWS received from submitters whom the agency believed to have made persuasive arguments as to why Exemption 4 applied to their information under the test employed under *National Parks & Conservation Assn v. Morton* , 498 F. 2d 765 (D.C. Cir. 1974), to determine whether information is "confidential" for purposes of 5 U.S.C. § 552(b)(4), and (b) copies of those statements.   Willis Decl. ¶ 5.

71.    As explained in Paragraph 5 of the Second Hyde-Michaels Declaration, Exh. B to that declaration provided an index of 23 additional submissions from submitters with agency-sustained Exemption 4 objections who chose to provide further elaboration as to why Exemption 4 should apply to them, together with copies of the submissions. Willis Decl. ¶ 6.

72.    The submitters who, in the estimation of the agency, met the *National Parks & Conservation Ass'n* standard for establishing that they provided the government with "trade secrets and commercial or financial information obtained from a person and privileged or confidential" such that the submitted information qualified for the application of FOIA Exemption 4 also, by definition, meet the criteria for "trade secrets and commercial or financial information obtained from a person and privileged or confidential" under the Exemption 4 test

-14-

for "confidentiality" expressed by the Supreme Court in *Food Marketing Institute v. Argus Leader*, 588 U.S. , 139 S.Ct. 1471 (2019). Willis Decl. ¶ 7.

73.     This is because the agency has, from the outset, required that the submitters for whom it is presently asserting FOIA Exemption 4 to vouch to the FWS that "the information is confidential, that [the submitter has] not disclosed the information to the public, and that the information is not routinely available to the public from other sources." *See* 81 Fed. Reg. 75838, 75839 (Nov. 1, 2016) ("[I]f you object to the public disclosure of the records (or any portions of records) at issue in *Humane Society v. U.S. FWS*, No. 16-720 (D.D.C., filed Apr. 18, 2016), on the basis that the information submitted is protected by FOIA Exemption 4, then the regulations require [a] 'detailed written statement' ... to include a 'specific and detailed discussion' of the following: … Certification that the information is confidential, that you have not disclosed the information to the public, and that the information is not routinely available to the public from other sources."). Willis Decl. ¶ 8. A copy of the referenced November 1, 2016, Federal Register notice is attached here as Exhibit A to the declaration.   Willis Decl. ¶ 8 and Exh. A.

74.     Subsequent to the Court's August 15, 2019, Memorandum and Order, the FWS contacted submitters whose information the agency believes protected from public disclosure under FOIA Exemption 4. Willis Decl. ¶ 9.

75.     In its communication, the agency explained the current posture of the case and invited the submitter to expressly certify that the information at issue is confidential because it is both customarily and actually treated as private by its owner, that the owner had not disclosed

-15-

the information to the public, and that the information is not routinely available to the public through other sources. Willis Decl. ¶ 9.

76.     An example of the referenced communication is attached here as Exhibit B to the declaration. Willis Decl. ¶ 9.

77.     The FWS has received 27 statements in response. Willis Decl. ¶ 9. The statements are either from submitters, their attorneys, or, in some cases, both. Willis Decl. ¶ 9. An index of the statements is attached here as Exhibit C to the declaration of Cathy Willis. Willis Decl. ¶ 9 and Exh. C. Copies of the statements are attached to the declaration of Cathy Willis as Exhibit D to the declaration.   Willis Decl. ¶ 9 and Exh. D.

78.     The FWS is of the belief that the assurances of "confidential" treatment regarding the information at issue proffered by those for whom the agency is presently withholding information on the basis of FOIA Exemption 4 align with the concept of "confidentiality" expressed by the Supreme Court in *Food Marketing Institute*. Willis Decl. ¶ 9(second).

79.     Here, the agency had, prior to the Supreme Court's decision in *Food Marketing Institute*, received assurances from the submitters of the information at issue "that the information is confidential, that [the submitters at issue] have not disclosed the information to the public, and that the information is not routinely available to the public from other sources." Willis Decl. ¶ 9(second).

80.     The assurances from the submitters are, in the eyes of the FWS, in alignment with the Supreme Court having treated as "confidential" for purposes of FOIA Exemption 4 "commercial or financial information [that] is both customarily and actually treated as private by its owner." *See Food Marketing Institute*, 139 S.Ct. at 2366. Willis Decl. ¶ 9(second).

81.    The statements FWS received from submitters who were contacted by the agency following the Court's August 15, 2019, Memorandum and Order expressly explaining that the submitters maintained their information's "confidentiality" in a manner that aligns with the *Food Marketing Institute* stance on confidentiality.    Willis Decl. ¶ 9(second).

82.    The FWS is aware that the Supreme Court's ruling in *Food Marketing Institute* concerned a fact pattern, *i.e.*, Supplemental Nutrition Assistance Program redemption data concerning individual grocery retailers, in which the information at issue was "both customarily and actually treated as private by its owner *and* provided to the government under an assurance of privacy." *See Food Marketing Institute*, 139 S.Ct. at 2366; Willis Decl. ¶ 10.

83.    Prior to the decision in *Food Marketing Institute*, the FWS would not have thought that it would have had the latitude to "provide[ ] … an assurance of privacy" to the submitters of the LEMIS data at issue here, because the agency would have advised submitters that any submissions would be subject to federal disclosure law, and, at the relevant time, the submission of information at issue would have been subject to the "confidentiality" test set forth in *National Parks & Conservation Assn v. Morton* , 498 F. 2d 765 (D.C. Cir. 1974). Willis Decl. ¶ 10.

84.    The FWS followed its regulations and seriously analyzed the arguments that submitters made with respect to FOIA Exemption 4; and with respect to FOIA Exemption 4, the FWS has determined that releasing the limited information that the FWS has ultimately withheld on the basis of this exemption would likely cause substantial competitive harm by divulging the submitters' confidential commercial information.    First Hyde-Michaels Decl. ¶ 32; Second Hyde-Michaels Decl. ¶ 4 and Exh. A.

-17-

85.     The FWS reached this determination based on submissions to the FWS in response its aforementioned Federal Register notice showing that the submitters in question actually face competition and that substantial competitive injury to these submitters would likely result from the release.   First Hyde-Michaels Decl. ¶¶ 29-32.

86.     The FWS found that the release of the information it has ultimately withheld under FOIA Exemption 4 would likely imperil the FWS's ability to obtain the complete and accurate information it needs to meet its law enforcement mission in the future. First Hyde-Michaels Decl. ¶¶ 3-6, 32.

87.     The FWS has released all reasonably segregable LEMIS information sought by the Plaintiff in this litigation.    First Hyde-Michaels Decl. ¶¶ 11, 22-27, 32 and Exh. A; Second Hyde-Michaels Decl. ¶ 4-5 and Exh. A, Exh. B; Willis Decl. ¶¶ 5-10 and Exh. C and Exh. D.

Respectfully submitted,

JESSIE K. LIU, DC Bar #472845
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By:  _____/s/
        W. MARK NEBEKER, DC Bar #396739
        Assistant United States Attorney
        555 4th Street, N.W.
        Washington, DC   20530
        (202) 252-2536
        mark.nebeker@usdoj.gov

-18-

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Renewed Motion For Summary Judgment, supporting memorandum, statement of material facts and declaration as well as a proposed order has been made through the Court's electronic transmission facilities on the 22nd day of October, 2019.

/s/
W.  MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC   20530
(202) 252-2536
mark.nebeker@usdoj.gov
